NOTICE

Decision filed 06/24/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190307-U

NO. 5-19-0307

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* ESTATE OF DEWEY R. SLOAN, Deceased | ) | Appeal from the |
| | ) | Circuit Court of |
| (Jerry Leaf and David Leaf, as co-administrators of | ) | Richland County. |
| the Estate of Dewey R. Sloan, Petitioners-Appellees, | ) | |
| v. Thomas Sloan, Respondent-Appellant). | ) | No. 07-P-19 |
| | ) | |
| | ) | Honorable |
| | ) | Larry D. Dunn, |
| | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*: In a probate case where the decedent's nephew served as the decedent's power of attorney and opened a joint bank account with the decedent's funds, naming himself as a joint owner with right of survivorship of the bank account,  the co-administrators' citation to recover funds that the nephew withdrew from the account was not untimely under the five-year statute of limitations set out in section 13-205 of the Code of Civil Procedure (735 ILCS 5/13-205 (West 2006)). The trial court's finding that the nephew failed to overcome the presumption of fraud with respect to the funds he withdrew from the bank account was not against the manifest weight of the evidence. The circuit court properly ordered the nephew to pay the funds back to the decedent's estate.

¶ 2    The petitioners, Jerry Leaf and David Leaf, are the co-administrators of the estate

of Dewey R. Sloan (Rex). They brought a citation proceeding against the respondent,

1

Thomas Sloan (Tom), first seeking information with respect to financial transactions that took place during Rex's lifetime that were made by Tom as Rex's power of attorney. The co-administrators later sought recovery of funds from Tom that they claimed Tom obtained from Rex in violation of the fiduciary duty Tom owed to Rex. The circuit court entered an order directing Tom to reimburse Rex's estate a total of $71,817.67 for funds Tom withdrew out of a joint bank account that was funded with Rex's money. The circuit court also ordered Tom to reimburse the estate $22,815 for attorney fees and $2265.87 for costs incurred by the co-executors in bringing the citation to recover the funds. Tom now appeals the circuit court's judgment. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    This case presents a common probate scenario involving an estate's attempt to obtain the return of estate property alleged to be wrongfully concealed or controlled by another person. In the lower court proceedings, the co-administrators sought to recover Rex's funds that, the co-administrators maintained, Tom gained during Rex's lifetime as a result of Tom's breach of the fiduciary duty he owed to Rex as Rex's power of attorney. Although the lower court proceeding involved several financial transactions, on appeal, the parties' dispute has been narrowed in focus to only certain funds that Tom withdrew from a joint bank account (Trust Bank account) that Tom had with Rex. The Trust Bank account was funded with Rex's money and was established after Tom became Rex's power of attorney. The co-administrators maintained, and the trial court agreed, that Tom's withdrawals of funds form the Trust Bank account constituted a breach of the fiduciary duty Tom owed to Rex and that Tom must reimburse the estate for these funds.

2

Our background discussion will focus only on those facts in the record that are necessary for understanding the dispute surrounding the withdrawals of funds from the Trust Bank account. We begin our background discussion with a description of Rex's life in the years before he died, including the circumstances surrounding the establishment of the Trust Bank account.

¶ 5            A. Facts Leading Up to the Lower Court's Probate Proceedings

¶ 6      Rex was born in January 1926. He had four siblings, William Sloan (Bill), Orpha Vail, Lora Grace Leaf (Grace), and a brother who died during WWII. Rex never married or had children. Rex's siblings passed away before Rex. He had 13 nieces and nephews who were the children of Bill, Orpha, and Grace. The co-administrators are the sons of Grace. Tom is the son of Bill.

¶ 7      During his lifetime, Rex served in the Navy and worked as a carpenter after his service in the Navy. He resided in Florida for many years. In 2001, Rex owned two small residences in Florida, a motorcycle, a Jeep, and several bank accounts and investment accounts that were located in Florida.

¶ 8      In 2001, when Rex was 77 years old and when Rex's brother Bill was still alive, Bill received a telephone call from the Memphis, Tennessee, police department who informed Bill that Rex had been found in Memphis and was confused and lost. According to Tom, Rex was traveling to Illinois and stopped at a motorcycle shop in Memphis and merely "overdid himself and was tired." According to Tom's sister, Janet Smallwood, the police had found Rex naked in Memphis and not knowing where he was.

¶ 9    Bill and Tom drove to Memphis and brought Rex to Illinois. Rex later returned to his residence in Florida. However, according to Janet, when they took Rex back to Florida, Tom knew that Rex would not be living there long because Rex needed full-time guidance and was not in good shape mentally. Janet observed that Rex was very confused when he was brought to Illinois from Memphis and did not know his brother Bill.

¶ 10    In July 2001, all of Rex's assets were in Florida and were in Rex's name alone. Tom took Rex to an attorney, Tom Weber, who prepared a will and a power of attorney for healthcare and property for Rex. On July 17, 2001, Rex executed the power of attorney for healthcare and property, appointing Tom as his agent. On the same day, Rex also executed a will that left one-third of his estate to Bill and one-third each to the families of Orpha and Grace.

¶ 11    Attorney Weber testified that, prior to Rex signing the power of attorney and the will, Weber assessed Rex's competency to sign the documents to Weber's satisfaction. According to Weber, Rex was able to describe the nature and extent of his estate and give Weber instructions concerning how Rex wanted his estate distributed upon his death. Rex stated that he had two houses in Florida and approximately $150,000 in assets that need to be distributed. According to Weber, Rex wanted one-third of his estate to go to Bill, who was still alive at the time, one-third to Orpha's decedents, and one-third to Grace's decedents.

¶ 12    After becoming Rex's power of attorney, Tom began managing Rex's finances and investments. In a letter dated August 24, 2001, Tom informed Rex's financial advisor in Florida, Gerald Cohen, that Rex had appointed Tom as Rex's power of attorney for his

finances. Tom told Cohen that due to Rex's "health condition," all transactions involving Rex's account "must be authorized" by Tom. Tom requested a detailed and itemized statement of all transactions from Rex's account with Cohen from the time it was established to the date of the letter. When asked about this letter, Tom testified that, despite the content of the letter, he believed Rex was capable of handling his own finances when he wrote the letter. When asked about the health concerns stated in the letter, he testified that he believed that Rex's epileptic medications were confusing Rex.

¶ 13    The record establishes that, sometime before 2001, Rex had been diagnosed with some level of dementia and Alzheimer's disease. The record is conflicting with respect to the extent Rex suffered from the symptoms from these conditions and whether he was competent to handle his own financial affairs as a result. The circuit court resolved this factual dispute by finding that Rex was competent when he executed the power of attorney in July 2001, naming Tom as his agent. The circuit court also found as follows: "Rex is also presumed to have been competent throughout his remaining lifetime, including when the various transactions in question occurred." On appeal, no one has challenged this factual finding. Accordingly, for purposes of this appeal, Rex is deemed to have been competent until the time of his death. In this background section, we will highlight only some of the evidence in the record relevant to Rex's mental competence for purposes of understanding the circumstances leading up to the transactions at issue, not to challenge or question the circuit court's factual finding.[1]

---

[1]For example, the record includes testimony from one of Rex's doctors who opined that, in February 2006, Rex was unable to manage his own assets and property and that Rex would have lacked

5

¶ 14　Around March 18, 2002, while Rex was still living in Florida, Tom received a call from someone at a Florida hospital who informed Tom that Rex had been admitted to the hospital. Tom and his sister, Shirley Atkins, flew to Florida. When asked why Rex was the hospital, Tom testified that Rex was just dehydrated. Shirley, however, testified that, at the hospital, Rex was very confused and that the hospital staff had to tie Rex to his hospital bed. Shirley observed that Rex was in an extremely dirty physical condition because Rex had not showered in a long time.

¶ 15　At the hospital, Tom cleaned and bathed Rex. Shirley and Tom went to Rex's house and discovered it in a filthy condition with not much food available. According to Shirley, Rex stayed in the hospital a few days, and when he was released, he was too confused to be left alone at his home in Florida. Therefore, they decided to bring Rex back to live near them in Olney, Illinois.

¶ 16　The record indicates that when Rex was brought to Illinois, he lived at Bill's house for a short period of time until April 2002, when Tom moved Rex into Mary Burgin's boarding home in Olney. Documents admitted into evidence established that the cost for Rex to live at the boarding home was $2000 per month. The $2000 per month included room and board, laundry services, three meals a day, phone service, and emergency transportation services.

---

that capacity for at least two to three years prior to that time period. The circuit court, however, apparently gave little weight to the doctor's opinion, finding that Rex remained competent until the day of his death. We need not discuss the doctor's opinion as the factual questions surrounding Rex's competency are not at issue on appeal.

¶ 17    On March 26, 2002, Tom opened the Trust Bank account that lies at the center of this appeal. The account was held jointly in Tom's and Rex's names with rights of survivorship. The record on appeal includes the documents associated with this account that Trust Bank kept in its files. Trust Bank's documents included a copy of the power of attorney and the account application. Rex's signature does not appear anywhere on the account application documents. The Trust Bank account application contained Tom's address and phone number and his signature as Rex's power of attorney with respect to a "backup withholding certification." Tom testified that he set up this account for convenience purposes in handling Rex's finances. Specifically, he stated that the Trust Bank account was for record-keeping purposes, and he agreed that the funds in the account belonged to Rex and were to be spent only for Rex's benefit.

¶ 18    Sometime in 2002, Tom introduced Rex to a certified financial planner, David Lobacz. Lobacz did not know anything about Rex's medical history. However, according to Lobacz, because of Rex's advanced age, Lobacz asked Rex questions designed to make sure Rex was coherent when they talked about financial matters. Lobacz did not witness any kind of dementia symptoms or incoherence when he spoke with Rex about his investments. According to Lobacz, no transactions involving Rex's investments were directed by Tom. Lobacz recalled that all directions with respect to investments came from Rex himself.

¶ 19    Transactions involving Rex's investments made by Lobacz were challenged by the co-administrators in the lower court's citation proceeding. However, these transactions are no longer at issue in this appeal. Accordingly, for purposes of this appeal,

it is sufficient to note that Lobacz arranged for the transfer of Rex's financial assets into the Trust Bank account where the funds were temporarily held until they were transferred from the Trust Bank account into various investments at Lobacz's direction.

¶ 20   The largest portion of Rex's financial assets was his individual retirement account (IRA) that had a balance of $140,403.37 around the time Lobacz began managing Rex's investments. Due to Rex's age, he was required to take disbursements from the IRA. The IRA disbursements were set up to be annual disbursements that went directly into the Trust Bank account. Lobacz was not involved with paying Rex's living expenses or his day-to-day needs. Therefore, Lobacz had no knowledge of how Tom used any of the annual IRA disbursements or other income that was deposited into the Trust Bank account.

¶ 21   From April 2002 through May 2003, Tom wrote 15 checks on the Trust Bank account that resulted in Tom receiving $9093.44 in cash from the account or funds from the account being deposited into Tom's personal or business bank accounts.

¶ 22   On June 26, 2003, Tom moved Rex from Mary Burgin's boarding home to an assisted living facility, Emerald Glen. Emerald Glen provided a higher level of assistance for its residents than the assistance Mary Burgin's boarding home offered for its residents. Tom testified that he moved Rex from the boarding home because Emerald Glen was less expensive.

¶ 23   As part of the admission process at Emerald Glen, the nursing staff at the facility prepared a report titled "Resident Assessment Instrument." This report noted that Rex's cognitive skills for daily decision making was "moderately impaired." With respect to

8

how Rex managed cash and finances, the report stated that Rex was "not involved at all in performing" these activities. Another report prepared by Emerald Glen's nursing staff stated, among other things, that Rex needed assistance with money transactions and that, with respect to "financial matters, Rex "[n]eed[ed] supervision with every transaction and family/and POA [was] available to assist."

¶ 24   On October 14, 2003, the director of Emerald Glen involuntarily discharged Rex from the facility because Rex was urinating in inappropriate places, including the corner of the common space of the facility and sometimes in plants. Rex also came out of his room naked on several occasions. Accordingly, the director of Emerald Glen determined that Rex had to be removed from the facility. The director explained that Rex's mental condition had progressed to the point that the facility was no longer appropriate for him. The director also stated that Rex was a little more confused than Tom had told her when she accepted Rex into the facility. The director agreed that while Rex resided at Emerald Glen, Tom visited Rex two or three times per week and took Rex out of the facility maybe once per week.

¶ 25   After being discharged from Emerald Glen, Tom moved Rex back to Mary Burgin's boarding home. According to Tom, no one told him that Rex ever misbehaved at Mary Burgin's boarding home. Tom also explained that Rex had not wanted to move to Emerald Glen and was happy when he returned to the boarding home. During the time Rex lived at Emerald Glen, Tom wrote two checks on the Trust Bank account that resulted in Tom receiving $400 from the account.

9

¶ 26    At some point after Rex returned to the boarding home, Tom reported to Lobacz that Rex's condition was worsening. In a report dated April 17, 2004, Lobacz wrote that Tom had told Lobacz that Rex's condition was worsening "to the point that he felt we should move more money out of the estate." Lobacz testified that the plan was to move money out of Rex's name so that if the State of Illinois had to start paying for Rex's care, the State could not access any of Rex's investments. Therefore, Lobacz began transferring ownership of a large portion of Rex's investments into Tom's name alone.

¶ 27    As stated above, the co-administrators challenged Lobacz's transfer of ownership of Rex's investments to Tom while Rex was alive. The circuit court, however, found that none of these transfers were initiated by or made at the direction of Tom as Rex's power of attorney but were undertaken with Rex's approval. The circuit court, therefore, denied the co-administrators any relief with respect to investments and transfers made by Lobacz, and, as indicated above, those transfers are not at issue on appeal. Parenthetically, we note that the transfers left Rex with approximately $24,000 in investments in his name alone that, on his death, were distributed outside of the estate in accordance with the beneficiary designations on the account.

¶ 28    Rex died on August 19, 2006, while still living at Burgin's boarding home. His death certificate stated that the cause of his death was "Alzheimer's." For a period beginning when Rex moved back to the boarding home until his death, Tom wrote 13 checks on the Trust Bank account resulting in $70,950 of funds from the Trust Bank account going to Tom in the form of cash or deposits into Tom's personal or business bank accounts. Two days after Rex died, Tom wrote a $700 check to himself on the Trust

10

Bank account. Tom closed the account on September 19, 2007, by withdrawing the last $158.53 that remained in the account.

¶ 29                  B. The Lower Court's Probate Proceedings

¶ 30    In his will, Rex had designated Tom to be the executor of his estate. However, when no one filed Rex's will or otherwise opened an estate, one of Rex's other nephews, John Leaf, who was one of Grace's sons, filed a petition to probate Rex's will and for the appointment of his two brothers, Jerry and David Leaf, to serve as co-administrators. Tom then filed a petition for the appointment of himself as the administrator.

¶ 31    The Leaf brothers objected to Tom serving as the administrator of the estate. They believed that Tom, as Rex's agent, had concealed, converted, or had in his possession or control, property belonging to Rex's estate. The Leafs stated their intent to pursue a citation proceeding against Tom and argued, therefore, that Tom had a conflict of interest and could not serve as the estate's administrator. After an evidentiary hearing, on May 30, 2007, the circuit court entered an order admitting Rex's will to probate and appointing Jerry Leaf and David Leaf as co-administrators of the Rex's estate.

¶ 32    On July 24, 2007, the co-administrators filed a citation to discover information directed at Tom pursuant to section 16-1 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/16-1 (West 2006)). The co-administrators sought information concerning Tom's handling of Rex's finances while Tom acted as Rex's power of attorney. The co-administrators also filed a citation to discover information directed at Lobacz and a citation for information directed at Trust Bank.

11

¶ 33   On May 12, 2008, the circuit court conducted the Trust Bank citation hearing. At the hearing, Trust Bank's president and CEO, Bruise A. Runyon, testified about the opening of the Trust Bank account. The circuit court admitted into evidence the documents Tom signed in opening the account and the monthly statements for the bank account from the date it was opened until it was closed.

¶ 34   The record indicates that, after the Trust Bank citation hearing, nothing happened in the circuit court for over four years. On December 12, 2012, Tom filed a motion requesting the circuit court to enter an order closing the case for lack of prosecution. In response, the co-administrators alleged that they had obtained medical records and a report from Rex's treating physician and had requested a supplement to the treating physician's report. In addition, the co-administrators alleged that they had received and reviewed numerous records from Trust Bank, that they were interviewing witnesses, and that the citations were still pending with respect to Tom and Lobacz and would be set for hearing in the near future. On December 17, 2012, the circuit court denied Tom's motion to close the case and scheduled hearings on the pending citations.

¶ 35   On March 20, 2013, the circuit court conducted the Lobacz citation hearing. Lobacz testified about his handling Rex's investments beginning in 2002. The circuit court admitted numerous documents, including letters and account statements, pertaining to Lobacz's handling of Rex's investment. As noted above, the investments that Lobacz managed for Rex are no longer at issue in this case.

¶ 36   Following the Lobacz citation hearing, Tom filed a motion to strike the citation proceeding against himself alleging that Lobacz's testimony "established conclusively

12

that none of the assets which were the subject matter of that proceeding were in any way unduly influenced by [Tom] nor is there any basis for turning over said assets."

¶ 37   On May 8, 2013, the parties appeared in court for a hearing on the citation to discover information directed at Tom and for a hearing on Tom's motion to strike the citation. In arguing the motion to strike, Tom asserted that there was no petition alleging that he had estate assets and no allegations of undue influence and that he could not defend against a citation when there were no allegations directed at him.

¶ 38   In response, the co-administrators argued that there was a petition for citation pending with respect to Tom and that it had been pending since it was filed in July 2007. They argued that they were "now ready to proceed with this citation against [Tom] to discover what information or assets he may have in his possession," and that their inquiry was not limited to the investment accounts Lobacz handled. They concluded, "so today we're ready to proceed with the citation with [Tom] to attempt to either locate information or assets or try to tie down assets that we believe [Tom], as agent under the Power of Attorney, transferred improperly to himself."

¶ 39   In reply, Tom argued that the co-administrators had his responses to interrogatories and requests for production of documents stemming from the pending citation for information for several years and had not requested any further information. Tom argued that it seemed "kind of late to be doing a fishing trip based on information they had six years ago." The co-administrators, however, maintained that the pleadings on file were sufficient to recover information or assets from Tom.

13

¶ 40　The circuit court noted that the citation with respect to Lobacz was fulfilled in March 2013 but there had not been a full citation hearing with regard to whether Tom had any estate assets or information relevant to the petition for citation. The circuit court also observed, however, that the co-administrators had filed a request for a citation for information but that no citation had ever been issued. The circuit court noted that the co-administrators' prayer for relief in the citation for information was that Tom be ordered to provide information. The circuit court, therefore, stated that it was prepared to go forward with the citation hearing if co-administrators stipulated that they were not seeking property at the hearing, that the hearing was only for discovery purposes, and that the co-administrators would file a separate pleading for the recovery of property.

¶ 41　The parties agreed to proceed with the May 8, 2013, hearing as a discovery citation proceeding and not a proceeding for the recovery any estate property at that time. In a docket entry, the circuit court wrote that Tom's motion to strike was withdrawn as moot "in light of fact that parties and counsel stipulate that Thomas ('Tom') Sloan will testify today in/as to a discovery information proceeding but no recovery/return will be ordered this date."

¶ 42　At the hearing, the co-administrators' attorneys asked Tom questions about his handling of Rex's finances as Rex's power of attorney and, particularly relevant to this appeal, questions about checks Tom wrote on the Trust Bank account that resulted in funds from the Trust Bank account going to Tom. Tom testified that the Trust Bank account "was primarily set up for Rex" and agreed that his (Tom's) "name was on [the account] simply as a convenience" and for Rex's benefit. He agreed that when he opened

14

the account, he intended for the account to be Rex's account. He testified that he opened the account as a joint account because that was what Rex wanted.

¶ 43    Tom testified that all of the money that was withdrawn from the Trust Bank account was spent for Rex's benefit. When asked whether he could produce receipts or other proof that the money was spent for Rex, Tom replied "probably." Tom added, "I might be able to, I might not. I don't know." At one point during questioning, Tom told one of the co-administrators' attorneys that he did not want to provide them with any documents and that the attorneys were "always twisting and turning things around." In addition, Tom answered many of the co-administrators' questions with statements such as "I don't recall," "I don't remember," "It could have been ***," "I could have ***," "I'm not for sure."

¶ 44    Tom testified that when Rex died, there was not enough money in the Trust Bank account to cover Rex's funeral expenses. Tom also testified that he deposited $17,000 of his own money back into the Trust Bank account after Rex died so that there would be some money to distribute to Rex's other nieces and nephews. He testified that he put this money into the account so that it appeared that Rex had left them something under the will although the Trust Bank account had been depleted. Tom gave each cousin a check for $2500 from the Trust Bank account.

¶ 45    Tom also testified that he sold Rex's Jeep and motorcycle as Rex's power of attorney and that he "probably" deposited those funds into the Trust Bank account. However, he was not sure that he did deposit the proceeds into the Trust Bank account and he also could not produce any documents to show what happened to the proceeds.

15

¶ 46    At the conclusion of the co-administrators' examination of Tom, the co-administrators asked the circuit court to require Tom to produce any documents he had with respect to the sale of Rex's real estate, the sale of Rex's Jeep and motorcycle, any life insurance policies on Rex's life, and any information Tom had with respect to the financial accounts Rex had in any Florida financial institution. Tom's attorney asked that the request be put in writing and stated that they would respond within 21 days.

¶ 47    The circuit court asked the attorneys about "further scheduling," stating, "I don't know what further scheduling you all were going to ask for, if there was anything else." After a discussion off the record, the court stated on the record that the "discovery citation" directed at Tom was concluded. One of co-administrators' attorneys suggested, "perhaps we can either do a file to the court or a status hearing to see if there's a next step to be initiated as a result of this discovery proceeding and the documents that Tom Sloan provides us, because we don't want to let this languish like it has been." The attorney stated that once the documents were provided, he anticipated "then proceeding with the filing of this recovery action next, once we have that other documentation."

¶ 48    The circuit court held a status hearing on June 17, 2013. Tom's attorney stated that Tom had provided the co-administrators with the documents requested at the citation hearing. The circuit court wrote in a docket entry that it gave the co-administrators until July 31, 2013, in which "to file additional pleadings (citation to recovery)."

¶ 49    On July 31, 2013, the co-administrators filed a six-count petition for citation to recover assets pursuant to section 16-1 of the Probate Act (755 ILCS 5/16-1 (West 2008)). Count I of the petition listed checks and debits from the Trust Bank account

16

written to or for the benefit of Tom. The co-administrators noted that Tom made a deposit into the Trust Bank account that Tom had designated as a loan payment concluded that Tom owed the estate the difference between the amounts he withdrew from the account and the amount he paid back into the account.

¶ 50    In count II, the co-administrators listed eight checks totaling $16,104.27 that were written on the Trust Bank account by Tom and were written to pay for services to improve Bill's home while Bill was alive. The co-administrators requested the circuit court to order Tom to reimburse the estate for those funds.[2] In counts III and IV, the co-executors noted Tom's sale of Rex's Harley-Davidson motorcycle and Jeep. They alleged that the proceeds from the sale of those assets were never deposited into Rex's checking account and that the proceeds were assets belonging to the estate. They requested the circuit court to enter an order directing Tom to reimburse the estate the proceeds from the sale of those assets.

¶ 51    In count V, the co-administrators alleged improprieties with respect to the financial assets managed by Lobacz, including the transfer of some of these investments to Tom and changes to the payable on death designations for the investments that remained in Rex's name at the time of his death. The co-administrators alleged that Rex's funds invested through Lobacz belonged to the estate and should be returned to the

---

[2]The circuit court found that Rex approved the use of these funds for the improvement of Bill's house and denied the co-administrators' request in count II that Tom reimburse the estate for the use of these funds. This finding is not at issue on appeal.

17

estate.[3] Finally, in count VI, the co-administrators requested that the circuit court order Tom to pay punitive damages.

¶ 52    On August 26, 2013, Tom filed a motion to dismiss the citation, arguing that the petition was barred by the applicable statute of limitations. The circuit court denied the motion to dismiss. In a September 16, 2013, docket entry, the court wrote "that the Petition for Citation to Recover Assets filed 7/31/13 relates back to the Petition for Citation to Discover filed 7/24/07."

¶ 53    Beginning January 28, 2014, the circuit court conducted a two-day hearing on the citation for the recovery of assets directed at Tom. At the hearing, Tom again agreed that all the money deposited into the Trust Bank account was Rex's money except the money he put in the account to pay his cousins upon Rex's death. Tom explained that he did not sign any of the checks on the account as Rex's power of attorney because, he testified, the Trust Bank account was also his own checking account. He agreed, however, that the account was set up for convenience purposes and that it "was primarily used to keep record keeping" and was mostly Rex's money. He testified, "I set up the joint account for record keeping for Rex."

¶ 54    Tom testified that on average he probably traveled 200 miles or more a week taking Rex to doctor appointments and other activities. Tom testified that most of the time he paid for Rex's expenses on his personal or business credit cards. He testified that he also used his personal checkbook and cash from his pocket. When questioned by his

---

[3]As stated, the circuit court found against the co-administrators with respect to count V, and the circuit court's factual findings with respect to count V are not at issue on appeal.

18

attorney, Tom testified that he never took anything from Rex that was not for Rex's benefit and never did anything except what Rex wanted.

¶ 55 Tom testified that he spent "close to 25 hours a week taking Rex places, doing things every week." Those activities included several cataract surgeries, dental work, and other medical appointments. He testified that he took care of everything for Rex and that all of Rex's medical appointments were an hour to two hours away from Olney. The appointment locations included the VA hospital in Marion and eye doctors in Effingham. Tom testified that he took Rex to have pedicures and manicures, to a dermatologist for skin cancer, and had shoes made for Rex. Tom explained that he bought Rex's clothes and toiletries, took Rex for haircuts, and took Rex on motorcycle rides. Tom claimed that on average it cost him and his wife over $40,000 per year to take care of Rex from 2001 until Rex died and that he paid those expenses out of his pocket when needed. However, Tom did not produce any credit card receipts as evidence of Rex's expenses that he paid with his own funds. For the time Rex stayed at the boarding home, the Trust Bank account showed $2000 paid each month to the boarding home for Rex's board, laundry services, three meals a day, phone service, and emergency transportation services.

¶ 56 Tom testified that he sold Rex's Harley-Davidson motorcycle for $3000 and that the proceeds from the sale probably went into the checking account or used to pay expenses. Tom testified about selling Rex's Jeep but did not remember how much he sold it for or what specifically he did with the proceeds from the sale.

¶ 57 Following the two-day citation hearing in which Tom and other witnesses testified, on September 30, 2014, the circuit court conducted a second citation hearing

involving Lobacz. Although Lobacz had already testified at a citation hearing, the transcript of the previous hearing could not be produced. Therefore, on September 30, 2014, Lobacz testified a second time with respect to his handling of Rex's investments.

¶ 58    On December 22, 2014, the circuit court conducted a status conference and made a docket entry indicating that the parties had submitted written arguments in support of their positions on the issues raised by the citation to recover assets directed at Tom. The circuit court noted that the attorneys did not wish to make any further argument and, therefore, the circuit court took the matter under advisement, indicating that it would enter a written order.

¶ 59    Nothing further appears to have occurred in the proceeding for over two years, until March 2, 2017, when Tom filed motion to cite additional authority. The circuit court then conducted several status hearings and entered a 41-page order and memorandum of its decision on November 6, 2017.

¶ 60    In its November 6, 2017, order, the circuit court noted that Tom was, at times, more like a son to Rex than a nephew and that, among all of Rex's nieces and nephews, Tom had the closest relationship with Rex. However, with respect to the checks Tom wrote on the Trust Bank account that resulted in Rex's funds going to Tom, the circuit court held that the removal of these funds by Tom from the Trust Bank account violated the fiduciary duty Tom owed to Rex. The circuit court noted that Tom testified that he often paid Rex's expenses with his own credit cards or with cash and would then write checks to himself to pay himself back for those expenses he advanced on Rex's behalf.

However, the circuit court also noted that "Tom never brought forward any credit card records or receipts to support his testimony in this regard."

¶ 61    The circuit court held that, as a matter of law, because Tom was Rex's power of attorney at the time Tom wrote the checks, there existed a presumption that any transaction that benefited Tom was procured through fraud or undue influence and that Tom had the burden of rebutting that presumption by presenting some evidence to the contrary. In assessing the evidence in light of this presumption, the circuit court made the following factual finding:

> "Tom Sloan's 'proof problem' with regard to rebutting the presumption of fraud/breach of fiduciary duty is that he has not provided sufficient documentation to specifically show that he had provided and how much he has provided in consideration and/or in amounts specifically paid toward Rex's expenses and/or the repayment of loans. Particularly lacking are Tom Sloan's own personal/business credit card receipts and/or account statements and/or any other documentation showing such consideration, payment of expenses or repayment of such loans. It is Tom Sloan's burden and duty to bring that documentation forward. He did not. Any such documentation would be clearly within and under Tom Sloan's control, particularly as compared to the other siblings and cousins involved in this litigation. And, when [the co-administrators' attorney] asked Tom Sloan what if any such documentation he had, Tom Sloan replied that he didn't know/or that he really didn't want to provide it."

21

¶ 62    The circuit court identified 27 specific checks that Tom wrote on the Trust Bank account and one debit from the account that were paid either to Tom or deposited into Tom's personal or business accounts. The circuit court found that Tom failed to rebut the presumption that such payments were obtained by fraud or undue influence. These transactions totaled $71,301.97. From that total, the circuit court deducted $5484.30 that, the circuit court found, Tom had paid back into the Trust Bank account as loan payments. Therefore, with respect to count I, the circuit court concluded that Tom must return the balance of $65,817.67 to the estate.

¶ 63    With respect to counts III and IV, which concerned Tom's sale of Rex's motorcycle and Jeep, the circuit court found that Tom failed to rebut the presumption of fraud/breach of fiduciary duty stemming from these sales. The circuit court noted that Tom never presented any documents to show the deposit of the proceeds from these sales into the Trust Bank account or other evidence to show the expenditures of these proceeds for Rex's benefit. The circuit court, therefore, ordered Tom to return $3000 to the estate for the sale of Rex's motorcycle and to return $3000 to the estate for the sale of the Jeep.

¶ 64    With respect to the co-administrators' request for punitive damages in count VI, the circuit court denied the request for punitive damages but granted the co-administrators leave to file a petition for attorney fees and costs and reserved ruling on any subsequent request for fees and costs.[4] The co-administrators' attorneys subsequently

---

[4]As indicated above, the circuit court denied the co-administrators' request for relief in counts II and V of the petition, finding that Tom did not breach his fiduciary duties with respect to the payments for improvements to Bill's house (count II) and with respect to any of the transactions involving the investment accounts handled by Lobacz (count V).

filed fee petitions and, on July 5, 2019, the circuit court entered an order finding Tom personally liable for $22,815 in attorney fees and $2265.87 in costs incurred by the co-administrators. The circuit court ordered Tom to reimburse the estate for these attorney fees and costs. In total, the circuit court ordered Tom to reimburse the estate of $71,817.67 for funds he withdrew from the Trust Bank account in breach of his fiduciary duty and reimburse the estate $25,080.87 for attorney fees and costs incurred by the co-administrators. Tom now appeals the circuit court's judgment.

¶ 65                                    II. ANALYSIS

¶ 66    The first issue Tom raises on appeal concerns the statute of limitations for citation proceedings. The issue of whether the citation was untimely under the applicable statute of limitations presents us with a question of law that we will review *de novo. In re Estate of Lashmett*, 369 Ill. App. 3d 1013, 1016 (2007). Tom argues that the co-administrators' citation for recovery of assets that they filed on July 31, 2013, was untimely pursuant to the applicable statute of limitations. However, Tom does not cite any specific statutory limitations period that he believes is applicable in this case. Therefore, we are left to speculate concerning what specific limitations period Tom believes applies.

¶ 67    The co-administrators' claims against Tom for the recovery of estate assets were based on an alleged breach of the fiduciary duty Tom owed to Rex as Rex's power of attorney. A claim based on a breach of fiduciary duty must be brought within five years after the cause of action accrued pursuant to section 13-205 of the Code of Civil Procedure (Code). 735 ILCS 5/13-205 (West 2008) ("all civil actions not otherwise provided for"); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605,

23

618 (2007) ("Pursuant to section 13-205 of the Code, a breach of fiduciary duty claim must be brought within five years after the cause of action accrued."). Accordingly, we will analyze the timeliness of the co-administrators' citation proceeding under the five-year statute of limitations set out in section 13-205 of the Code.

¶ 68   The co-administrators brought the citation proceeding pursuant to section 16-1 of the Probate Act, which provides as follows:

"(a) Upon the filing of a petition therefor by the representative or by any other person interested in the estate ***, the court shall order a citation to issue for the appearance before it of any person whom the petitioner believes (1) to have concealed, converted or embezzled or to have in his possession or control any personal property, books of account, papers or evidences of debt or title to lands which belonged to a person whose estate is being administered in that court or which belongs to his estate or to his representative or (2) to have information or knowledge withheld by the respondent from the representative and needed by the representative for the recovery of any property by suit or otherwise. ***

* * *

(d) The court may examine the respondent on oath whether or not the petitioner has proved the matters alleged in the petition, may hear the evidence offered by any party, may determine all questions of title, claims of adverse title and the right of property and may enter such orders and judgment as the case requires." 755 ILCS 5/16-1 (West 2008).

¶ 69     The purpose of a citation proceeding under section 16-1 is to recover an estate's assets. *In re Estate of Zagaria*, 2013 IL App (1st) 122879, ¶ 24. During the citation proceeding, the circuit court has power to determine the title and right to property and enter such orders as the case requires. *In re Estate of Elias*, 408 Ill. App. 3d 301, 315 (2011). "[T]he citation procedure may be used repeatedly with regard to the same subject matter." *Lashmett*, 369 Ill. App. 3d at 1018; *Schwaan v. Schwaan*, 320 Ill. App. 287, 289 (1943). A finding by the circuit court that certain property belonged to the estate will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Elias*, 408 Ill. App. 3d at 315.

¶ 70     In the present case, the co-administrators initiated the original citation proceeding directed at Tom on July 24, 2007, when they filed a citation to require him to produce documents and answer questions about Rex's assets and finances. Applying the five-year statute of limitations to this initial citation petition, we note that all of the transactions that are at issue on appeal occurred within five years of the filing of the initial citation for information except two: (1) a $2400 check Tom wrote on April 4, 2002, and (2) a $1023.44 check Tom wrote on May 2, 2002. However, with respect to these two checks, the five-year statute of limitations would not have expired under the discovery rule.

¶ 71     Under the discovery rule, which is applicable to claims based on a breach of fiduciary duty, the cause of action accrues and the limitations period begins to run when the plaintiff knew or reasonably should have known of the injury and that it was wrongfully caused. *Fuller Family Holdings, LLC*, 371 Ill. App. 3d at 618. Here, the co-administrators would not have had sufficient knowledge concerning whether these

transactions constituted a breach of fiduciary duty until the completion of their citation for information. Accordingly, the statute of limitations had not expired for any of the 17 withdrawals at issue when the co-administrators brought the original citation against Tom on July 24, 2007.

¶ 72 Having determined that the original citation was timely with respect to all of the transactions at issue on appeal, we then note that the first citation hearing at which Tom appeared and answered questions occurred on May 8, 2013. At that hearing, the parties agreed that the proceeding that day was for discovery purposes only, not for the recovery of any assets. The co-administrators, however, expressly stated their intent to seek a recovery of estate assets once they completed the citation for information. Therefore, at the conclusion of the May 8, 2013, hearing, the citation directed to Tom remained at issue. The co-administrators then filed the six-count petition seeking the recovery of assets on July 31, 2013. Under these facts, the co-administrators' claims for the recovery of assets were timely under the relation back doctrine. Specifically, the co-administrators' July 31, 2013, petition for a citation for the recovery of assets related back to the filing of the original citation for information.

¶ 73 The relation back doctrine is codified in section 2-616(b) of the Code as follows:

"The cause of action, cross claim or defense set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action

26

asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery or defense asserted, if the condition precedent has in fact been performed, and for the purpose of preserving the cause of action, cross claim or defense set up in the amended pleading, and for that purpose only, an amendment to any pleading shall be held to relate back to the date of the filing of the original pleading so amended." 735 ILCS 5/2-616(b) (West 2008).

¶ 74    "A liberal construction of the requirements of section 2-616(b) is necessary 'to allow the resolution of litigation on the merits and to avoid elevating questions of form over substance.' " *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 21 (quoting *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88, 102 (1995)). "The purpose of the statute is to preserve causes of action against loss by reason of technical default unrelated to the merits." *Id.* (citing *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 355 (2008)).

¶ 75    Under section 2-616(b), an amended pleading relates back to the date that the original pleading was filed if the following two requirements are satisfied: (1) the original pleading was timely filed, and (2) the causes of action asserted in the amended pleading grew out of the same transaction or occurrence that was set up in the original pleading.

27

735 ILCS 5/2-616(b) (West 2008); *Porter*, 227 Ill. 2d at 353; *Lawler*, 2017 IL 120745, ¶ 21.

¶ 76 In the present case, as we established above, if we apply the five-year statute of limitations set out in section 13-205 of the Code, the co-administrators timely brought their original citation for information with respect to all of the transactions at issue. Therefore, the first requirement of the relation back doctrine is met. In addition, with respect to the second requirement of the doctrine, the exact same transactions were the subject matter of the citation for information as the citation for recovery. Accordingly, the second requirement is met.

¶ 77 In the original citation, the co-administrators sought to discover information from Tom which, in turn, led to the basis for the recovery of estate assets from Tom. As Rex's power of attorney, Tom had the information relevant to his use of the Trust Bank account funds that he withdrew. Both the original and subsequent citation petitions centered on Tom's use of Rex's assets while Tom was Rex's power of attorney. Although the original petition was a citation for information, the original petition sufficiently alerted Tom that the co-administrators questioned the validity of the transactions at issue which afforded Tom adequate opportunity to investigate the evidence relevant to those transactions. See *In re Estate of Nichols*, 188 Ill. App. 3d 724, 728 (1989) (where the court noted that, with respect to the relation back doctrine, the "courts must be mindful that one of the purposes of a statute of limitations is to provide defendants with sufficient opportunity to investigate factors upon which their liability may be based while relevant evidence is still ascertainable").

28

¶ 78    In applying the relation back doctrine in this case, we find *In re Estate of Chernyk*, 138 Ill. App. 3d 233, 234 (1985), to be persuasive. In *Chernyk*, the decedent's widow filed a citation to discover assets pursuant to section 16-1 of the Probate Act approximately five months after her deceased husband's will was admitted to probate. The widow's citation sought to discover information and to compel the production of documents that, the widow claimed, may lead to the discovery of estate assets held by the defendants. Specifically, the widow sought information regarding a trust that the defendants prepared and that the deceased husband purportedly executed, naming the defendants as trustees and beneficiaries of the purported trust. *Id.*

¶ 79    The court conducted the discovery citation hearing over 19 months after the will was admitted to probate, and the defendants appeared at the discovery citation hearing and were examined. *Id*. At the conclusion of the proceeding, the widow was granted leave to amend her discovery citation to a citation to recover estate assets. *Id.* Over 22 months after the discovery citation hearing, the widow filed her amended petition for citation to recover assets against the defendants which included a request that the court set aside the purported trust agreement. *Id*. at 234-35.

¶ 80    The defendants argued that the widow's request to set aside the trust agreement was untimely under section 13-223 of the Code which required that an action to set aside a trust agreement must be commenced within six months after the admission of the will to probate. *Id.* at 234. The circuit court agreed and dismissed the widow's petition seeking recovery of estate assets. *Id*. at 235.

¶ 81　On appeal, the *Chernyk* court considered the informality of the citation procedures set out in the Probate Act and considered the liberality in which pleadings in general are allowed. *Id.* at 236. The court also observed that there are two types of citation proceedings under section 16-1 of the Probate Act, one in the nature of discovery, which formed the basis of the widow's original petition, and the other being an adversarial proceeding in which the title and right to personal property is contested and which formed the basis of the widow's amended petition. *Id.* at 237. The court then concluded that the widow's amended petition seeking to set aside the trust related back to the filing of the original petition for information, which was filed within the time required for seeking to aside a trust agreement. *Id.*

¶ 82　In the present case, the facts are similar to those in *Chernyk*. The co-administrators' original citation for information was for discovery purposes, and the information they gleaned from that citation hearing formed part of the basis for bringing the citation for recovery of estate assets. Under these facts, the recovery citation related back to the date of the filing of the information citation. Accordingly, the co-administrators' claims were timely under the five-year statute of limitations set out in section 13-205 of the Code. Although the petition seeking the recovery of estate property was not labeled as an amendment to the original information citation, we consider the substance of pleadings, not their title. *People ex rel. Ryan v. City of West Chicago*, 216 Ill. App. 3d 683, 688 (1991) ("In determining the nature of a pleading or a motion, courts are not bound by the title given to the document by a party; instead, the substance of the document will be examined."). In addition, as explained above, the courts liberally

30

construe the relation back doctrine encompassed within section 2-616(b) of the Code to avoid elevating questions of form over substance. *Lawler*, 2017 IL 120745, ¶ 21. Accordingly, under the reasoning applied by the *Chernyk* court, the co-administrators' citation to recover assets related back to the filing of their original citation for information. As a result, we reject Tom's claim that the citation for recovery of assets was time barred.

¶ 83   Although we have analyzed the timeliness of the co-administrators' claims pursuant to the five-year statute of limitations as set out in 13-205 of the Code, we note that in *Lashmett*, 369 Ill. App. 3d at 1018, the court held that the five-year statute of limitations contained in section 13-205 of the Code does not apply to citation proceedings. The *Lashmett* court reasoned that, because the circuit court's "jurisdiction sitting in probate extends to all property of the decedent, no matter where it may be found or when," the five-year statute of limitations "cannot apply." *Id.* The *Lashmett* court continued, "To allow the statute of limitations to bar the recovery of an asset of the estate would serve to defeat the jurisdiction of the probate court and effectively restrict the statutory and common-law power of the court to supervise the administration and disposition of estates." *Id.*

¶ 84   In the present case, because applying the five-year statute of limitations does not result in barring any of the co-administrators' claims against Tom, we need not determine whether we agree with the *Lashmett* court's holding that the five-year statute of limitations is inapplicable to citation proceedings. In resolving this appeal, it is enough to note that, under either scenario, Tom's timeliness argument fails.

¶ 85    Next, Tom argues that the circuit court erred in requiring him to reimburse the estate for the money he withdrew from the Trust Bank account. We disagree.

¶ 86    As a matter of law, a fiduciary relationship was established when Tom obtained the power of attorney on July 17, 2001. *Deason v. Gutzler*, 251 Ill. App. 3d 630, 637 (1993) (in Illinois, a power of attorney creates a fiduciary relationship between the principal and the agent as a matter of law). The agent under a power of attorney has a fiduciary duty to the principal who made the designation. 755 ILCS 45/2-7(a), (b) (West 2014); *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12. The mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for himself, and if the agent does so, the transaction is presumed to be fraudulent. *Id.* Therefore, any conveyance of the principal's property that either materially benefits the agent or is for the agent's own benefit is presumed to be fraudulent. *Id.*

¶ 87    The presumption of fraud is not conclusive and may be rebutted with evidence that the agent exercised good faith and did not betray the confidence placed in him. *Jones v. Washington*, 412 Ill. 436, 441 (1952). If the agent rebuts the presumption of fraud, the transaction in question will be upheld. *Spring Valley Nursing Center*, *L.P.*, 2012 IL App (3d) 110915, ¶ 13.

¶ 88    A rebuttable presumption does not shift the burden of proof, and is not evidence itself, but arises as a rule of law or legal conclusion, which establishes a *prima facie* case of undue influence, in the absence of evidence to the contrary. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 461-62 (1983). Stated differently, the presence of a

32

presumption in a case only has the effect of shifting the party against whom it operates the burden of going forward and introducing evidence to meet the presumption. *Id.* at 462. If evidence is introduced which is contrary to the presumption, the presumption will cease to operate. *Id.*

¶ 89    The amount of evidence necessary to meet the presumption is not determined by any fixed rule and depends on the circumstances of each case. *In re Estate of Pawlinski*, 407 Ill. App. 3d 957, 966 (2011). Some of the significant factors to be considered in determining if the presumption of fraud has been rebutted include whether the fiduciary made a frank disclosure to the principal of the information he had, whether the fiduciary paid adequate consideration, and whether the principal had competent and independent advice. *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 13. The fiduciary must show by clear and convincing evidence that he exercised good faith. *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757 (1988). Where there is a fiduciary relationship, a gift is not presumed, regardless of the relationship of the parties involved. *Id.* at 758. A circuit court's determination as to whether a presumption of fraud had been overcome, made after an evidentiary hearing, is entitled to deference and will not be reversed on appeal unless it is against the manifest weight of the evidence. *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 14.

¶ 90    In the present case, having reviewed the evidence presented in the proceedings below, we conclude that the circuit court's finding that Tom failed to rebut the presumption of fraud concerning his withdrawals from the Trust Bank account was not against the manifest weight of the evidence.

¶ 91 The Trust Bank account was opened on March 26, 2002, for convenience purposes only. The documents signed when the account was opened do not include Rex's signature. Instead, the forms included a "backup withholding certification" that Tom signed as Rex's power of attorney. Trust Bank kept a copy of the power of attorney in its records associated with the account. During his testimony, Tom agreed that the money that was deposited into the Trust Bank account was Rex's money that was to be spent only for Rex's benefit. He agreed that the account was set up for convenience purposes and that it "was primarily used to keep record keeping" in handling Rex's finances. He testified, "I set up the joint account for record keeping for Rex."

¶ 92 Tom became Rex's fiduciary after Rex began suffering symptoms stemming from dementia and Alzheimer's disease. Tom did not become a joint tenant on any of Rex's bank accounts until after he became Rex's fiduciary. Tom did not contribute his own money to the account and did not present evidence that Rex intended to give Tom the money in the Trust Bank account, nor did Rex receive independent advice about setting up and managing the Trust Bank account.

¶ 93 The record includes multiple checks Tom wrote on the Trust Bank account that resulted in Tom either receiving cash from the Trust Bank account or placing funds from the Trust Bank account into Tom's personal or business bank accounts. Nothing in the record established that Rex had knowledge of Tom's withdrawals of funds from the account. In addition, Tom did not provide evidence to show that these funds were reimbursement for his own money that he spent for Rex's benefit as he claimed during his testimony. When he was asked about the money withdrawn from the account, he gave

34

vague and evasive answers and told the co-administrators' attorney that he did not want to provide the attorney with any documents.

¶ 94    In light of this evidence, the trial court's finding that Tom must reimburse Rex's estate for funds Tom withdrew from the Trust Bank account was not against the manifest weight of the evidence. The record supports the trial court's finding that Tom had not "provided sufficient documentation to specifically show how much he had paid toward Rex's expenses and, therefore, failed to rebut the presumption that of fraud or breach of fiduciary duty with respect to funds withdrawn from the Trust Bank account."

¶ 95    Tom argues that the record was replete with testimony about the time he and Rex spent together, including evidence that Tom spent time caring for Rex's needs such as taking him to doctor appointments and visiting him frequently. Tom argues that this evidence established that Rex wanted Tom to have the funds left in the Trust Bank account when he died. He argues that he did not remove any money from the Trust Bank account under his power of attorney but removed the funds as an owner of the account. He argues that any money he did not take out of the account during Rex's lifetime should have passed to him as a joint owner of the account upon Rex's death. Accordingly, Tom concludes, the estate suffered no loss or injury from any money Tom spent from the account during Rex's lifetime.

¶ 96    It is true that the creation of a statutory joint tenancy, such as the Trust Bank account in the present case, normally creates a presumption of donative intent. *Murgic v. Granite City Trust & Savings Bank*, 31 Ill. 2d 587, 589 (1964). A party claiming adversely to the creation of the joint account usually has the burden of proving by clear

and convincing evidence that a gift was not intended. *Id.* In the present case, however, the presumption of donative intent does not apply because Tom opened the Trust Bank account with Rex's funds as Rex's power of attorney and exclusively for the stated purpose of convenience in managing Rex's finances. Under such circumstances, there is no presumption of donative intent on the part of Rex with respect to Rex's funds deposited into the account. Instead, there is a presumption of fraud or undue influence in the establishment of the account with Tom as a joint owner with the right of survivorship.

¶ 97 Where the attorney-in-fact actively uses his position to create a joint account, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome. *In re Estate of DeJarnette*, 286 Ill. App. 3d 1082, 1089 (1997) (citing *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 890 (1994)). This is particularly true when the joint account is a convenience account. A convenience account is a joint account where the creator did not intend the other "tenant" to have any present or future interest in the account. *In re Estate of Shea*, 364 Ill. App. 3d 963, 969 (2006). Tom offered no evidence to rebut the presumption of fraud or undue influence in the establishment of the Trust Bank account as a joint account. Therefore, we reject Tom's argument that the circuit court erred in not honoring his right to survivorship as a joint owner of the Trust Bank account.

¶ 98 Finally, Tom argues that the circuit court erred in granting an injunction. Tom does not identify with specificity which portion of the circuit court's judgment that he believes is improper injunctive relief. In addition, he did not raise this issue in the proceedings below. Normally, issues not objected to at the circuit court level or raised in

a posttrial motion are forfeited for review on appeal. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14. Regardless, the argument has no merit.

¶ 99 The circuit court ordered Tom to return assets of the estate, which included $65,817.67 of Rex's funds that Tom withdrew from the Trust Bank account, $3000 of proceeds Tom received from the sale of Rex's motorcycle, and $3000 Tom received from the sale of Rex's Jeep. The court ordered Tom to pay a total of $71,81.67 to the co-administrators of the estate. This relief granted by the circuit court was an appropriate order in a proceeding involving a citation to recover assets of an estate.

¶ 100 Section 16-1(d) of the Probate Act authorizes the circuit court to "enter such orders and judgment as the case requires." 755 ILCS 5/16-1(d) (West 2008). The statute provides that, if the respondent

> "refuses to obey the court's *order to deliver any personal property* or, if converted, its proceeds or value, or books of account, papers or evidences of debt or title to lands, the court may commit him to jail until he complies with the order of the court or is discharged by due course of law and the court may enforce its order against the respondent's real and personal property in the manner in which judgments for the payment of money are enforced." (Emphasis added.) *Id.*

¶ 101 Here, the circuit court's order directed Tom to deliver funds to the co-administrators to the estate. The circuit court's order, therefore, does not exceed the remedies that are available under section 16-1(d) of the Probate Act.

¶ 102                                III. CONCLUSION

¶ 103 For the foregoing reasons, we affirm the circuit court's judgment.

¶ 104  Affirmed.